## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 03-225 (RMC)** |
| | ) | |
| **FREDERICK BOOKER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court is Defendant Frederick Booker's Motion to Suppress, upon remand from the Court of Appeals for further consideration in light of the Supreme Court's decision in *Thornton v. United States*, 541 U.S. 615 (2004). *United States v. Booker*, No. 03-3164, 2004 WL 2348146 (D.C. Cir. 2004). In *Thornton*, the Court held that "[s]o long as an arrestee is the sort of 'recent occupant' of a vehicle such as [Thornton] was here, officers may search that vehicle incident to the arrest." *Thornton*, 541 U.S. at 623-24. Instructed by *Thornton*, the Court must reverse its prior ruling and deny the motion to suppress. Two of Mr. Booker's other pending motions — a motion *in limine* to exclude evidence of seized U.S. currency, and a motion *in limine* to preclude expert testimony — which became moot after the Court's earlier decision on the suppression motion, are also addressed herein and will be denied.

### I. BACKGROUND FACTS

Mr. Booker and an unknown passenger were traveling in a white Crown Victoria automobile in Northeast Washington, D.C., on May 7, 2003, when they passed an unmarked police

vehicle traveling in the opposite direction.[1]  The officers, who were part of the auto theft unit of the

Metropolitan Police Department's ("MPD") Fifth District, immediately noticed that the front license

tag was not displayed in brackets on the front of the car but, instead, was placed inside the

windshield on the front right side.  Transcript ("Tr.") at 6 (testimony of Officer Bryan Wymbs).  The

police proceeded away from the Crown Victoria until they were able to make a U-turn.  *Id.* at 7-8.

When they caught up with the Crown Victoria, it had traveled approximately three to four blocks and

parked on the side of the road.  As the officers rounded the corner, they saw Mr. Booker and his

passenger getting out of the car.  *See id.* at 18 (Wymbs testimony) ("We came around the corner, he

had already pulled in front of that location and was in the process or in the process of exiting the

vehicle.").  The police pulled up to the Crown Victoria, with the front of their car just next to, but

not overlapping, the rear bumper of the Crown Victoria.  At that point, Mr. Booker was already out

of the car and had closed the door.  He was in the process of walking away from the car, *id.* at 20,

when Officer Wymbs alighted from the unmarked police car, identified himself as a police officer,

and ordered Mr. Booker and his passenger to stop.  The passenger immediately fled.  Officer Glenn,

the driver of the unmarked police car, threw the cruiser into reverse and tried without success to

apprehend the passenger.

       In the meantime, Officer Wymbs grabbed Mr. Booker by the arm and handcuffed him.

At some point, Mr. Booker dropped the keys to the Crown Victoria, but it is unclear whether this was

before, during, or after Mr. Booker was cuffed.  It is clear, however, that when asked for the keys

Mr. Booker denied having them and that Officer Wymbs, who had seen them drop, retrieved them

---

[1]  The facts are not in dispute, unless noted, and are taken from the transcript of the
motions hearing on November 18, 2003, the Court's credibility determinations based on the
demeanor and testimony of the witnesses, and from the parties' presentations.

from the ground.  At that point, Officer Glenn returned from his unsuccessful effort to apprehend

the passenger and asked Mr. Booker if he had a license.  When Mr. Booker stated that he did not,

he was arrested formally for driving without a permit.  Mr. Booker identified himself as Charles

Booker, the name of his deceased brother to whom the Crown Victoria was registered.

The officers proceeded to search the Crown Victoria and located a book bag that

contained an Intratec machine gun with magazine, a Ruger handgun, and a large ziplock that held

79 smaller ziplocks containing marijuana.  Officers also recovered two cellular phones and over

$1600 in U.S. currency from Mr. Booker's person.

## II.  DISCUSSION

### A. Motion to Suppress

Mr. Booker moved to suppress the tangible evidence against him, arguing that the

officers did not have probable cause or a reasonable articulable suspicion that he was engaged in

criminal activity when they approached him.  These arguments rested on two alternative grounds:

(1) the officers had no legitimate reason to stop Mr. Booker because his tags were "dealer" tags that

were correctly displayed; and (2) even if the initial stop were permissible, the officers' search of the

car was impermissible under *United States v. Fafowora*, 865 F.2d 360 (D.C. Cir. 1989) (interpreting

the contours of *New York v. Belton*, 453 U.S. 454 (1981), and *Chimel v. California*, 395 U.S. 454

(1969)).  The Court initially ruled against Mr. Booker on the first ground.  However, it granted the

motion to suppress on the second ground, finding as a factual matter that Mr. Booker was outside

the Crown Victoria and walking away from it when the police encountered him, and that, as a legal

matter, *Faforwora* drew a bright-line rule placing such circumstances under the framework of

*Chimel* rather than *Belton*.

### 1. *Thornton*, *Belton*, and *Chimel*

In *Thornton*, however, the Supreme Court rejected such a bright-line rule and "conclude[d] that *Belton* governs even when an officer does not make contact until the person arrested has left the vehicle." *Thornton*, 541 U.S. at 617. Noting that "*Belton* allows police to search the passenger compartment of a vehicle incident to a lawful custodial arrest of both 'occupants' and 'recent occupants,' " *id.* at 622, the Court instructed that

> while an arrestee's status as a "recent occupant" may turn on his temporal or spatial relationship to the car at the time of the arrest and search, it certainly does not turn on whether he was inside or outside the car at the moment that the officer first initiated contact with him.

*Id.* (footnote omitted). Despite clear recognition that it was highly unlikely that Mr. Thornton could have reached the relevant contraband once he was outside his vehicle, the Court emphasized its preference for *Belton* over *Chimel*, noting that the latter approach — which gauges the propriety of a search in large measure on whether a suspect could be within reach of guns, drugs, or other contraband — would lead to "unworkable and fact-specific" inquiries that are untenable on the streets. *Id.* at 623 n.3. The *Thornton* majority specifically focused on its finding that an arrest itself leads to a charged atmosphere that can cause danger to police officers and, thus, the need to search a vehicle for their own protection even though it is unoccupied. *See id.* at 621. Noting Mr. Thornton's concession that he was "temporally and spatially" near the vehicle at the time police initiated contact, *id.* at 619, the Court held that "[s]o long as an arrestee is the sort of 'recent occupant' of a vehicle such as [Mr. Thornton] was here, officers may search that vehicle incident to the arrest." *Id.* at 623-24.

Mr. Booker argues that he was not a "recent occupant" of the Crown Victoria within

the meaning of *Thornton*.  Norman Brooks, a witness on Mr. Booker's behalf, testified that Mr. Booker had walked to the middle of the street and was talking to friends when the unmarked police vehicle drove up and Officer Wymbs grabbed and handcuffed Mr. Booker.  Tr. at 31-32.  Mr. Booker further submits that he no longer had control over the Crown Victoria, having discarded the keys, and that he had no chance to reach any contraband contained in the car.

  These arguments must fail.  As Justice Scalia points out in his *Thornton* concurrence, at the time of the search Mr. Thornton "was neither in, nor anywhere near the passenger compartment of his vehicle.  Rather, he was handcuffed and secured in the back of the officer's squad car."  *Thornton*, 541 U.S. at 625 (Scalia, J., concurring in the judgment).  If Mr. Thornton was a "recent occupant" under those circumstances, the Court must conclude that so was Mr. Booker here.[2]  As the officers rounded the corner and drove up to the Crown Victoria, Mr. Booker exited that car, closed the door, and started to walk away in a single fluid movement.  Taking the evidence in the light most favorable to Mr. Booker, he had, at best, the chance to take three steps away from the car before Officer Wymbs reached him.  The time involved must have been negligible.  Under the new *Thornton* test — namely, "that an arrestee's status as a 'recent occupant' may turn on his temporal or spatial relationship to the car at the time of the arrest and search," *id.* at 622 (footnote omitted) — Mr. Booker was clearly a "recent occupant" of the Crown Victoria, making it subject

---

 [2]  *Thornton* leaves somewhat unclear precisely how "close [in] proximity" to his car Mr. Thornton was when the police first made contact, as opposed to when they conducted the search. *See id.* at 618-19; *see also id.* at 636 (Stevens, J., dissenting) ("We are not told how recent is recent, or how close is close, perhaps because in this case 'the record is not clear.' ") (citing *United States v. Thornton*, 325 F.3d 189, 196 (4th Cir. 2003)).  However, the Court specifically declined to limit the scope of *Belton* to those "within 'reaching distance' of the car," *id.* at 622 n.2, and made clear that it intended to embrace a *Belton*-like "clear rule, readily understood by police officers and not depending on differing estimates of what items were or were not within reach of an arrestee at any particular moment."  *Id.* at 623.

to lawful search as long as his arrest was lawful.

    To avoid this conclusion, Mr. Booker urges the Court to consider and follow Justice Scalia's concurring opinion in *Thornton*.  Justice Scalia noted that the rule announced in *Belton*, which allowed the search of a car's passenger compartment incident to arrest, rested on the  need "to protect officer safety or prevent concealment or destruction of evidence."  *Id.* at 625 (Scalia, J., concurring).  However, he specifically adopted the view that " '[i]n our search for clarity, we have now abandoned our constitutional moorings and floated to a place where the law approves of purely exploratory searches of vehicles during which officers with no definite objective or reason for the search are allowed to rummage around in a car to see what they might find.' "  *Id.* at 628 (citing *United States v. McLaughlin*, 170 F.3d 889, 894 (9th Cir. 1999) (Thomas, J., concurring)).  Therefore, Justice Scalia would "limit *Belton* searches to cases where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  *Id.* at 632.  It is on this suggested analysis that Justice Scalia, joined by Justice Ginsburg, concurred in the result in *Thornton*, because a frisk of Mr. Thornton had revealed illegal drugs and the search of Mr. Thornton's car sought evidence relevant to the crime of arrest.  Mr. Booker notes that, here, his "crime of arrest" was driving without a license, as to which no further evidence might be found in the Crown Victoria.  He urges the Court to follow Justice Scalia's lead and invalidate the search because it was unnecessarily broad in scope.

    It is certainly intriguing that both Justices Scalia and Ginsburg would propose a wholesale change to the analysis of car searches when the occupant has left the vehicle before encountering the police. These Justices are not commonly of one mind.  Justice O'Connor's partial concurrence with the *Thornton* majority raises intriguing questions as well.  While joining all but

one footnote of the majority opinion (and thus making it a majority), Justice O'Connor separately

expressed "dissatisfaction with the state of the law in this area" and observed that "the approach

Justice Scalia proposes appears to be built on firmer ground." *Id.* at 624-25 (O'Connor, J.,

concurring in part). These ruminations notwithstanding, this Court is bound by the majority opinion,

to which Justice O'Connor gave her vote, and is not at liberty to follow the approach advanced by

Justice Scalia.[3]

Because, on these facts, Mr. Booker was clearly a "recent occupant" of the Crown

Victoria, the motion to suppress evidence will be denied to the extent that it relies on *Thornton*.

### 2. Propriety of the Initial Stop

A traffic stop must be reasonable under the circumstances. *See Whren v. United*

---

[3] In this regard, the Court does not view Justice O'Connor's refusal to join footnote four of the majority opinion as providing the opportunity to adopt Justice Scalia's rationale. In that footnote, four members of the *Thornton* majority (Chief Justice Rehnquist and Justices Kennedy, Thomas and Breyer) agreed:

> Whatever the merits of Justice Scalia's opinion concurring in the judgment, this is the wrong case in which to address them. . . . The question presented . . . does not fairly encompass Justice Scalia's analysis. . . . And the United Stats has never had an opportunity to respond to such an approach. Under these circumstances, it would be imprudent to overrule, for all intents and purposes, our established constitutional precedent, which governs police authority in a common occurrence such as automobile searches pursuant to arrest, and we decline to do so at this time.

*Id.* at 624 n.4. It cannot be said that Justice O'Connor's refusal to join in this point of procedure diluted her vote in favor of the majority opinion or her agreement that "the opinion is a logical extension of the holding of *New York v. Belton*." *Id.* at 624 (O'Connor, J., concurring in part). The majority quite clearly held that police officers may search a vehicle incident to the lawful arrest of a person who was a "recent occupant." *Id.* at 622. This Court finds that the facts of the instant case present no close question or difficult issue: Mr. Booker got out of his car and began to step away in full view of the police officers as they drove up; he had taken no more than two or three steps (six feet at the furthest) before he was physically stopped. Thus, the temporal and spatial relationship was nearly immediate.

*States*, 517 U.S. 806, 810 (1996).  A stop is reasonable when officers have probable cause to believe that a traffic violation has occurred.  *Id.*  While probable cause is assessed under a test that considers the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 238 (1983), the standard is also an objective one.  "It is well-settled that in evaluating the reasonableness of a particular traffic stop, it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"  *United States v. Hill*, 131 F.3d 1056, 1059 (D.C. Cir. 1997) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)) (internal quotation marks omitted).  "In other words, reasonable suspicion to stop and search a motorist depends on 'the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.' "  *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

The D.C. Code makes it unlawful to operate any motor vehicle without having "attached thereto and displayed thereon the identification tags required therefor," D.C. Code Ann. § 50-1501.04(a)(1)(B), punishable by a \$1000 fine, 30 days' imprisonment, or both.  *Id.* § 50-1501.04(b)(1).  The government argues that the Crown Victoria needed a properly displayed front tag under D.C. Mun. Reg. §§ 18-422.1, -422.4.  Because the front tag was improperly displayed on the windshield, it submits, the officers had probable cause to believe a violation had occurred.  Mr. Booker argues that because the car was identified by dealer tags, one valid rear tag is sufficient under D.C. Mun. Reg. § 18-422.2.  Mr. Booker further argues that the officers' initial uncertainty as they passed him should have evaporated when they pulled up behind the Crown Victoria and perhaps might have been able to see the dealer's tag on the rear of the car; after all, he points out, these

-8-

officers were experienced policemen from the auto fraud unit.

The Court ruled on this point at the initial motions hearing, but did so without elaboration because its focus was on whether the search of the vehicle was lawful. To be more clear, the Court concludes that the officers properly made a brief investigatory stop because, on these facts, their suspicion that the Crown Victoria was being operated in violation of the D.C. Code (and related regulations) was objectively reasonable. As an initial matter, it is unnecessary to resolve whether the Crown Victoria had regular tags or dealer tags, and thus whether D.C. Mun. Reg. §§ 18-422.1, -422.4 or § 18-422.2 apply, because it is undisputed that, regardless, a front tag was improperly displayed on its windshield.[4] Therefore, the officers' initial sighting of the Crown Victoria gave them reason to believe that it was operating in violation of the D.C. Code requirements for tags. *See United States v. Hill*, 131 F.3d 1056, 1061 n.3 (D.C. Cir. 1997) ("It was not necessary for the [district] court to determine whether or not a VIN actually appeared on Hill's temporary tags at the time of the stop. Even if the court assumed that . . . the tags contained a VIN at the time of the stop, the stop was still permissible as long as the officer's belief that the VIN was missing was objectively reasonable.").

Moreover, after making a U-turn and pulling up next to the Crown Victoria, the officers' attention was distracted by the immediate departures of the driver and passenger; indeed, when the passenger took flight, their attention was understandably diverted. Under these circumstances, there is no basis to fault the officers for having failed to study the rear tag and realize

---

[4] Further, § 18-422.2 provides: "Motorized bicycles, motorcycles, trailers, and vehicles identified by a dealer's tag shall display *only* one (1) valid identification tag on the rear of the vehicle." D.C. Mun. Reg. § 18-422.2 (emphasis added). Thus, it is not clear that Mr. Booker was in compliance with § 18-422.2, as he urges.

that it might have been a dealer tag.  Given the totality of the circumstances, the officers' belief that

the tags were improper was objectively reasonable and, thus, the initial stop was lawful.  Therefore,

the Court will deny Mr. Booker's motion to suppress.

**B.  Motion in Limine to exclude Money**

Mr. Booker has moved to exclude any testimonial or physical evidence regarding the

$1,695.82 in U.S. currency found on his person at the time of his arrest.  He argues that this evidence

is not probative of his possession of the drugs or his intent to distribute them, and only serves to

intimate improperly that he is a drug dealer.

Mr. Booker is charged in Count 1 with possession with intent to distribute cannabis

in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D).  The D.C. Circuit has held that "[i]ntent to distribute

may be inferred from a combination of suspicious factors, such as possession of a relatively large

amount of cash, weapons, more than a minimal amount of narcotics, and activity in an area of 'high

narcotic trafficking.' "  *United States v. Gibbs*, 904 F.2d 52, 57 (D.C. Cir. 1990); s*ee also United

States v. Lindsey*, 47 F.3d 440, 445-46 (D.C. Cir. 1995) ("Intent to distribute may be inferred from

the presence of large amounts of cash, drug processing and packaging paraphernalia, large quantities

of drugs already packaged for street sale, and guns, especially when, as here, this evidence is

bolstered by expert testimony as to the use of these items in the drug trade."), *vacated and remanded

on other grounds sub nom. Robinson v. United States*, 516 U.S. 1023 (1995); *United States v.

Herron*, 567 F.2d 510, 513 (D.C. Cir. 1977) (observing that, in addition to the large quantity of drugs

and drug paraphernalia found in a residence, "[t]he $150 to $200 in cash that was on the table *next*

to the heroin packaged in folded tinfoil slips was also some evidence of distribution," as was "the

$16,000 in cash discovered elsewhere in the apartment"); *United States v. Lee*, 506 F.2d 111, 120

(D.C. Cir. 1974) (noting that intent to distribute was established, in part, by the presence in defendant's "apartment of over $3,000 in hidden cash and of drugs and material indicating a substantial wholesaling operation").

However, cash alone is insufficient to support an inference of drug trafficking. There must be other evidence of drug trafficking that, together with a sum of unexplained cash, is probative of previous drug transactions and thus gives rise to the inference of a future intent to distribute. *United States v. Stephens*, 23 F.3d 553, 556 (D.C. Cir. 1994) (holding that cash alone is insufficient to support inference of intent to distribute absent other evidence of distribution). The evidence surrounding Mr. Booker's case, however, is more than just cash. It includes two firearms — an Intratec machine gun with magazine and a Ruger handgun — and marijuana clearly packaged for street sales. *Cf. id.* (considering whether weapons were recovered and whether drugs were packaged for distribution). These provide sufficient corroborating evidence to permit admission of the currency as circumstantial evidence of an intent to distribute drugs.

Thus, Mr. Booker's motion to exclude testimonial or physical evidence regarding the U.S. currency will be denied.

### C. Motion to Exclude Experts

Mr. Booker has moved to exclude all government expert witnesses based on an alleged violation of Federal Rule of Criminal Procedure 16(a)(1)(G). Rule 16(a)(1)(G) provides:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P 16(a)(1)(G).  The government has provided Mr. Booker with discovery on three occasions: twice before a written request from defense counsel had been received, and once thereafter.  Mr. Booker argues that, in these disclosures, the government failed both to describe its witnesses' opinions with specificity and to provide the bases for those opinions.  As the government points out, the scope of the government's disclosure obligations under Rule 16(a)(1)(G) has not been addressed by the D.C. Circuit.  Mr. Booker relies, therefore, on the Seventh Circuit's decision in *United States v. Jackson*, 51 F.3d 646 (7th Cir. 1995), to support his argument.

In *Jackson*, the Seventh Circuit approved the following one-paragraph response to a request for disclosure of expert testimony and a summary of expert opinions as satisfactory under Rule 16:

> Please be advised that [the officers] may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.  In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics.  Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations.

Id. at 650.  The government's June 3, 2003, letter provided similar information to the defense in significantly greater detail.  *See* June 3, 2003, letter at 2-4 (describing with specificity the experience and qualifications of two potential narcotics experts, and noting six areas in which they would be competent to provide information or render an opinion — for example, that firearms and cellular phones are often used in narcotics transactions, and that possession of numerous individual packets of narcotics is consistent with an intent to distribute).  A subsequent letter, dated November 17, 2003, provided even further information that comports with the arguably stricter requirements of *United States v. Duvall*, 272 F.3d 825, 828-29 (7th Cir. 2001) (suggesting that disclosures are

insufficient when they list "general subject matters to be covered" but do not "identify what opinion the expert would offer on those subjects").  That letter explained that the fingerprint expert would explain the reasons why a fingerprint might not be obtained (condition of hands, equipment, secreter status, etc.).[5]  It also noted that the narcotics expert would testify that packaging for individual sale (here, in ziplocs), in small sizes at retail prices (here, at approximately $10 a bag), with total drug amounts inconsistent with personal use (as here), is consistent with intent to distribute.  Disclosures of such specificity meet the requirements of *Duvall*.

In any event, even if the government had provided insufficient information, exclusion of the testimony would not be the only remedy.  *See United States v. Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998) (observing that, when the government's discovery violation does not result from bad faith, a continuance to allow a defendant to prepare is usually the better sanction).  This case is a member of the "pass the case around class," having been handled by more than one defense counsel and more than one Assistant United States Attorney before the original Motion Hearing in November 2003. There is no evidence that any inadequacies in the government's release of discovery information was the result of bad faith.  More to the point, nearly two years have passed since the relevant information was fully disclosed in November 2003.  The government's appeal of the Court's ruling awaited the Supreme Court's 2004 decision in *Thornton*, which immediately signaled that the decision on the motion to suppress needed to be reconsidered and that the case may proceed to trial. Under these circumstances, Mr. Booker has had ample opportunity to identify and locate his own expert witnesses should he have chosen to do so.  Any possible prejudice arising from the alleged

---

[5] Mr. Booker separately challenges the government's notice of intent to call its fingerprint expert.  This intent was first disclosed in the June 2003 letter and was clarified in the November 2003 letter.  The disclosures in these letters likewise satisfy Rule 16(a)(1)(G).

late notice to him has been cured by the passage of time.

Therefore, Mr. Booker's motion to preclude expert testimony will be denied.

### III.  CONCLUSION

The Court has reconsidered its decision suppressing the evidence in this case.  In light of *Thornton*, it finds that the search of the vehicle driven by Mr. Booker was permissible as incident to his lawful arrest for a traffic violation.  The Court also confirms its ruling that the initial stop was proper and lawful.  Thus, Mr. Booker's motion to suppress will be denied.  Mr. Booker's motions to exclude evidence concerning the U.S. currency seized from his person and to preclude expert testimony will also be denied.  The government's Rule 404(b) motion remains pending.

An Order accompanies this Memorandum Opinion.

Signed: October 25, 2005                                    /s/
                                                     ROSEMARY M. COLLYER
                                                     United States District Judge